Khammoung PRASEUTH, Plaintiff,

v.

NEWELL–RUBBERMAID, INC., a corporation, et al., Defendants.

No. 00–1378–JTM.

United States District Court,
D. Kansas.

July 18, 2002.

Dwight A. Corrin, Wichita, KS, Gerald B Determan, Zampi and Associates, San Diego, CA, for plaintiff.

David S. Wooding, Terry L. Mann, Martin, Pringle, Oliver, Wallace & Bauer, LLP, Wichita, KS, for defendants.

*MEMORANDUM AND ORDER*

MARTEN, District Judge.

This matter comes before the court on cross motions for summary judgment in this employment discrimination case. Plaintiff asserts claims against the corporate defendants, alleging that both violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., and the Kansas Act Against Discrimination ("KAAD"), 44 K.S.A. § 44–1001, et seq. Plaintiff also claims the corporate defendants are liable to her for breach of an implied contract and invasion of privacy. Against the four individually named defendants, plaintiff asserts violations of the non-retaliation provisions of the ADA. Finally, plaintiff brings fraud claims against all of the defendants.

Plaintiff's motion for summary judgment was filed on February 11, 2002 and was fully briefed on April 15, 2002. Defendants' motion for summary judgment was filed on February 28, 2002 and was fully briefed on May 3, 2002. The motions are thus ripe for determination. On April 10, 2002, plaintiff did file a supplement to her response to defendants' motion for summary judgment. Defendants did not object to the first supplement. However, on June 13, 2002, plaintiff filed a second supplement to her response to defendants' motion for summary judgment. The second supplement noted a recent Supreme Court case that cut against one of plaintiff's positions, but also cited additional deposition testimony and included additional argument based thereon. On June 14, 2002, defendants moved to strike the second supplement, or alternatively, for permission to reply. By order dated June 20, 2002, the court denied defendants' motion to strike and granted the motion for permission to reply. The court thus will consider the testimony cited in plaintiff's second supplement and will further consider defendants' response to that supplement.

I. **Statement of Uncontroverted Facts**

A. **Objections**

Before discussing the factual record in this case, the court will address objections raised by both plaintiff and defendants. First, plaintiff seeks to establish the existence of her physical impairments through the use of testimony from two physicians named as experts in this case, Drs. Pollock and Cook and her treating physician, Dr. Cannon. Defendants object to this mode of proof, arguing that plaintiff is attempting to circumvent the court's gatekeeping role established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Defendants assert that utilizing expert testimony at the summary judgment stage denies the defendants an opportunity to subject the testi-

mony to the *Daubert* standard. Beyond the underlying *Daubert* objection, defendants make vague arguments regarding an alleged lack of foundation and non-specific attacks on the experts' knowledge of the facts and credentials.

The court concludes that defendants' basic argument is unfounded. It is clear that the law allows the use of expert testimony at the summary judgment stage and, in fact, requires expert testimony in a wide variety of cases. Defendants cite *Garrett v. Bryan Cave LLP*, 211 F.3d 1278, 2000 WL 430163 (10th Cir.2000) in support of their argument. In that case, the circuit indicated that "the testimony of an expert can be rejected on summary judgment if it is conclusory and thus fails to raise a genuine issue of material fact." *Id.* (quoting *Matthiesen v. Banc One Mortgage Corp.*, 173 F.3d 1242, 1247 (10th Cir.1999)). *Garrett* clearly indicates that the law contemplates the use of non-conclusory expert statements in support of summary judgment. Further, review of the doctors' testimony indicates that the stated opinions are not merely conclusory but are actually quite fact driven. As such, the opinions are useful to the court in determining plaintiff's physical condition.

Beyond the fact that the law contemplates use of proper expert testimony in support of summary judgment, defendants' *Daubert* argument is mooted by the fact that they have failed to make a *Daubert* motion with respect to Drs. Pollock, Cook, and Cannon. The court's deadline for *Daubert* motions was June 18, 2002. Defendants did file a timely *Daubert* motion, but it did not address either of these experts. Here, defendants' primary argument is that plaintiff cannot support a summary judgment motion with expert testimony because it would deny them the right to subject the expert testimony to *Daubert* scrutiny. Having now waived the right to request such *Daubert* scrutiny of

these two experts, defendants' objection is denied and the court will consider the testimony of Drs. Pollock, Cook, and Cannon with the caveat that the court will ignore purely conclusory statements that are not based in fact.

Second, in partial response to defendants' motion for summary judgment, plaintiff filed 82 pages of objections to a large majority of defendants' statement of facts. The objections fall, in large part, into three categories: relevance, lack of personal knowledge, and hearsay. The court has reviewed plaintiff's objections and finds the vast majority of them to be trivial at best and frequently could be considered absurd. To demonstrate, the court will address several of the objections taken at random. Starting at page 20 of plaintiff's objections, she addresses defendants' statement of fact number 43, which states: "In his [Mr. Southammavong's] opinion, plaintiff is able to use a knife safely if she is careful and does not cut herself." Defendants cite the following testimony from the witnesses' transcript: "Q: She has been able to do that safely? A: If she careful, I think it's okay, if she don't cut herself." Plaintiff objects to this fact statement on the ground that it consists of inadmissible opinion testimony. A witness who has observed plaintiff in the workplace is more than qualified to formulate a lay opinion as to whether plaintiff has been or will be able to safely use a knife without cutting herself. Such testimony does not require specialized knowledge of plaintiff's condition. At page 31 of the objections, plaintiff addresses plaintiff's statement of fact number 57, which states: "During that meeting, Marr asked plaintiff to go home and get updated restrictions from her doctor within two weeks." The cited testimony from plaintiff's deposition reads as follows: "A: Janice Marr told me to go home and to get new restrictions from my doctor. She said

that I had two weeks to get new restrictions." Plaintiff objects on the ground that this evidence is inadmissible hearsay. This objection is invalid as the statement of Marr is not offered for the truth of the matter, but only to establish what was said. Defendants are not attempting to prove through this testimony that plaintiff had two weeks to get new restrictions, but only that she was told that she had two weeks. At page 40, plaintiff objects to defendants' statement of fact number 75, which states: "The short-term disability forms completed or signed by plaintiff represent that she is totally disabled and not working." The cited evidence is the forms themselves. Plaintiff objects on hearsay grounds and lack of authentication. Plaintiff did not, however, object to the authenticity of the documents at the deposition. Nor does the court see any hearsay issue in this fact statement whatsoever. At page 50 of the objections, plaintiff addresses defendants' statement of fact number 91, which states: "Plaintiff's Social Security disability application was not successful and she was denied benefits." Defendants cited plaintiff's deposition testimony as follows: "Q: Did you get those benefits? A: No." Plaintiff now objects to this evidence as inadmissible hearsay because it is offered to prove that Social Security made a statement denying benefits. This objection is entirely frivolous and does not merit further comment. The court could keep selecting objections on a ten page interval and would continue to find objections that are totally lacking in merit, but for the sake of judicial economy it will not. Suffice it to say that plaintiff's objections are overruled unless otherwise noted in the statement of facts. Plaintiff will note that it is her duty to come forward with **FACTS** to controvert the assertions of defendants. To the extent plaintiff has failed to do so, the court must presume defendants' statements are uncontroverted. Plaintiff has, in large part, chosen to rely on senseless objections in an attempt to prevent the formulation of a workable record in this case. Despite plaintiff's approach to defendants' motion, the merits of this case will be fully considered.

## B. Procedural Background

Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") in April of 2000 and with the Kansas Human Rights Commission ("KHRC") in May of that same year. The EEOC issued a Notice of Right to Sue on July 17, 2000. Plaintiff filed the instant action on September 11, 2000 and defendants answered on October 31, 2000. Plaintiff filed an amended complaint on June 8, 2001 and defendants answered the amended complaint on July 2, 2001. Discovery closed on November 30, 2001 with the exception of discovery pertaining to expert witnesses.

## C. Identities of Parties and Witnesses

Plaintiff was employed at the Rubbermaid Home Products plant in Winfield, Kansas for approximately 19 years, from October 1980 to January 2000. Rubbermaid Home Products is a division of Rubbermaid, Inc. ("Rubbermaid"). Throughout her time at Rubbermaid, plaintiff was a production worker, operating various machines which manufactured the company's products. Plaintiff's native language is Laotian and she does not speak fluent English. Plaintiff is, however, able to read some English. Plaintiff has seven adult children. Angel Praseuth is one of plaintiff's daughters. Angel is thirty-two years old and lives in California. She speaks fluent English and Laotian.

Defendant Newell–Rubbermaid, Inc., is a corporation which was formed in March 1999 as a result of a merger between Newell Company and Rubbermaid. Rub-

bermaid is plaintiff's employer. Defendant William J. Denton was the group president and President of Rubbermaid Home Products Division from late March 1999 until July 2000. Denton's sole responsibility was for the activities within the Rubbermaid Home Products Division. Defendant Cynthia Konrath was the senior human resource representative for Rubbermaid in the Winfield area. She was the manager of human resources for the Winfield, Kansas plants and assisted other plants from time to time. Her job was to oversee the human resource department. She was involved with the management team at Rubbermaid Winfield and helped set the direction within the corporate structure for the plant. She also provided training relating to communication skills.

Defendant Debbie Littrell was the Group Benefits Administrator for Rubbermaid from sometime in 1994 through July 2000, when she left the company. Her job was to administer the benefits that the company offers, including short-term and long-term disability. Littrell would receive and process benefit requests, but she was not the decision maker regarding benefit issues. Defendant Janice Marr is the Safety Manager at Rubbermaid's Winfield plants and reports to defendant Konrath.

Ron Southammavong is plaintiff's brother. Plaintiff and Mr. Southammavong have lived together in the same house during all times relevant to this action. He has lived and worked in Winfield during all times relevant to this lawsuit. He is fluent in both English and Laotian. He frequently acts as an interpreter or translator for plaintiff and has attended several meetings and doctor appointments with plaintiff. Somsy Sengvixay is a Rubbermaid supervisor who is fluent in both English and Laotian. While plaintiff's testimony is somewhat unclear, on at least one occasion, Sengvixay was called upon to translate between plaintiff and other Rubbermaid employees. Defendants' Memorandum in Support, Plaintiff's Deposition, Exhibit 4, at p. 61.

### D. General Background Information about Rubbermaid

Every Rubbermaid employee, director or officer is known as an "associate." Production workers are thus associates, as are all supervisory employees. Rubbermaid has two plants in Winfield, Kansas, one on Wheat Road and one on 12th Street. Plaintiff worked primarily on the production floor at the Wheat Road plant. The production floor is divided into departments and cells. A department is made up of one or more cells. A cell is comprised of one or more machines which produce Rubbermaid products. Each machine may have multiple workers' stations, depending on the product being made at the relevant point in time. Certain machines, some of which plaintiff operated, were not included in any cells. Rubbermaid utilizes a "rotation" system for the production workers at its Winfield plants. In order to provide rest and relief from repetitive jobs, employees rotate positions every hour. Some positions are more difficult than others and the employees get to perform both the easy and the difficult.

It is uncontroverted that knife use is a major part of the production worker position at the Winfield plants. However, plaintiff does raise an issue as to the extent of required knife use. Perry Wozney served as operations manager at the Winfield plants from July 1999 to March 2001. He testified that, of the 80 machines in operation at the Wheat Road plant, anywhere from between 42 to 61 of the machines would not require knife use on a given day or shift. Plaintiff's Response to Defendants' Motion, Exhibit C, at 9–10 (page numbers reflect plaintiff's handwritten designation as opposed to deposition

transcript page number). Included in these estimates are positions where the worker could opt to use either a knife or a hammer to perform a required function. In that same vein, plaintiff testified that when she worked on machine 104, she removed excess pieces of plastic with a hammer, but she understood that a knife could be used to accomplish the same task. Steven McNinch, production manager at the Wheat Road plant since July 1998, estimated that from 10 to 60 percent of the production jobs at his plant could be done without use of a knife. Plaintiff's Response to Defendants' Motion, Exhibit D, at 6. Robin Goodno, team leader and subsequent production supervisor at the Winfield plants indicated that, of the machines in her area (total number unclear), eight could be operated without use of a knife on certain production runs, but that the number would vary given specific circumstances. It is clear that an unspecified number of machines at the Winfield plants did not require knife use at given points in the production cycles. Defendants contend that the various statements noted above are taken out of context because the various testimonies do not distinguish between extracting the products from molds using a knife or hand finishing a product with a knife. The court notes the confusion, but also concludes that the noted witnesses did indicate various numbers of positions that did not require knife use. The court cannot sort out the distinctions alleged by defendant, but must instead conclude that a fact issue exists regarding the number of positions in the Winfield plants that do not require knife use.

Rubbermaid does take steps to insure the safety of its employees, including: staffing a safety manager, employing engineers that have ergonomics training, stocking safety equipment, and giving employees working machines authority to shut them down should a safety problem arise. Additionally, Rubbermaid's production workers are protected from cuts through use of protective equipment, including: Kevlar gloves, and aprons and arm guards made of heavy leather covered with metal brads.

On January 1, 1995, Rubbermaid instituted a restricted duty policy in its Winfield plants. During her deposition, Ms. Konrath testified to an unwritten portion of the restrictive duty policy which has been termed the 50% rule or 50% qualification standard. Under the 50% rule, an employee who presented permanent restrictions was required to be able to work in 50% of the production worker positions available on a given day. If an employee with permanent restrictions who was not grandfathered under the restrictive duty policy is unable to work in 50% of the positions available on a given day, employment is terminated. The 50% rule was only applied to employees with permanent restrictions and employees with only temporary restrictions were not required to be able to perform 50% of the available positions. As alluded to above, the restrictive duty policy does not apply to restrictions existing and disclosed to Rubbermaid prior to January 1, 1995. Such restrictions were grandfathered in, meaning that rotation positions an employee could not perform due to such pre-existing restrictions were not evaluated as part of the available jobs in determining the 50% functionality level.

Once a permanent restriction is noted, the employee with the impairment is assessed to determine whether that impairment would prohibit working at more than 50% of the available positions. Defendants advance that when it is clear that an employee either can or cannot meet the 50% standard, such an evaluation is unnecessary. The facts do not clearly indicate if the policy provided for such a curtailed evaluation or whether a permanent restriction automatically entitled the employee to

a "walk-around," a process by which an assessment is made by walking around both Winfield plants to view each machine or cell job function which is available for use on that day. The manager who conducts the walk-around reviews the physician's documentation or restrictions and discusses with the employee which positions available on that day have activities which fit within the restrictions. The manager also inquires as to whether the company could make any accommodation that would allow the employee to perform each position being evaluated. If the employee, with or without accommodation, can perform the job functions in at least 50% of the available positions, then the employee will retain his/her position. If the employee fails to reach that mark, he/she is terminated. Additionally, the types of products made at the plants varies widely depending on the day selected for the walk-around. Thus, an employee could fail the 50% standard on one day and not the next.

To be clear, employees with temporary physical conditions do not participate in the "walk-around" procedure and are, in fact, not subject to the 50% standard. Instead, Rubbermaid's restrictive duty policy provides that an employee with temporary restrictions can be assigned light-duty positions for up to twenty-four weeks. The light-duty work can not exceed twenty-four weeks. Once the twenty-four week period is exhausted, the employee is placed on leave of absence for up to one year. This allows a sick or injured employee up to twelve months to attempt to recover from their physical maladies in order to return to work. Defendants make clear that both the written and unwritten portions of the restrictive duty program are applied without exception. Plaintiff asserts that the 50% standard is without justification. Defendants, on the other hand, contend that the rule facilitates job rotation, which has been shown to prevent injuries to workers.

**E. Plaintiff's Physical Condition**

Plaintiff has indicated that her physical problems include back, shoulder and neck pain and a blood disorder, specifically idiopathic thrombocytopenia purpura ("ITP"). Prior to January 1, 1995, plaintiff's doctor issued permanent restrictions on plaintiff's ability to perform overhead lifting tasks. Those restrictions are discussed in more detail in the following paragraphs. Plaintiff also advised Rubbermaid of the restriction prior to that date. Thus, plaintiff's lifting and overhead work restriction were "grandfathered in" under the restrictive duty policy.

Dr. Pollock, plaintiff's expert, performed a physical examination of plaintiff on August 22, 2001. The examination included an x-ray of her cervical spine. The examination indicated that she has a good range of motion of her shoulder, but that it is painful when plaintiff's shoulder is abducted beyond ninety degrees both in flexion and pure abduction. Dr. Pollock also reviewed plaintiff's medical records and history, which documented plaintiff's back and shoulder disorders from 1989 through 1994. Her history indicated that plaintiff was first diagnosed with chronic strain of the right shoulder girdle, a musculoskeletal disorder, in 1989. In 1992, plaintiff was given a lifting restriction of 15 to 20 pounds with no pushing or pulling. Also in 1992, plaintiff performed a Functional Capacity Evaluation ("FCE") which indicated that she could perform all aspects of her job except for overhead lifting. At the time of Dr. Pollock's examination in 2001, plaintiff continued to present chronic pain and weakness. He could not determine why the chronic strain had not diminished, but noted that plaintiff did not demonstrate any obvious malingering signs. Based on his examination and consideration of plaintiff's medical records, Dr. Pollock concluded that the FCE remained

accurate and that the 1992 restrictions remained appropriate. He further concluded that plaintiff's disorder is unlikely to improve in the future.

Beginning in 1992, plaintiff was and continues to be limited in her ability to lift objects while reaching over her head. Plaintiff remains unable to lift or carry objects weighing more than 20 pounds. She can lift this amount of weight only on an occasional basis. Plaintiff remains able to do light overhead work. If she frequently has to lift more than five pounds over her head, it causes severe pain. Plaintiff has difficulty putting on or removing clothing over her head. While she is able to engage in some twisting motions, if she turns the wrong way, it causes severe pain. Since her grandchildren were small babies, plaintiff has been unable to lift or carry them. She does, however, take care of her grandchildren one or two hours a day at least once a month. In her declaration in support of her motion, plaintiff indicates that she is in almost constant pain from her back and shoulder. At its worst, the pain prevents her from sleeping soundly for up to two weeks at a time, leading to fatigue. However, plaintiff testified that she can work in a sitting position, a standing position, stoop, walk, climb stairs, and pick up objects weighing less than 20 pounds. As previously noted, the permanent restrictions resulting from plaintiff's back, shoulder, and neck problems were "grandfathered in" under the restrictive duty policy and plaintiff was not subjected to the 50% rule analysis with regard to those restrictions.

In early 1993, plaintiff's treating physician, Dr. Michael Cannon, diagnosed plaintiff as having ITP, as set out above. From that diagnosis forward, plaintiff's medical records detailed extensive office, hospital, and laboratory information relating to ITP. Plaintiff's hematology expert, Dr. Cook, reviewed plaintiff's medical records, conducted a physical examination, took a complete blood count, and examined a peripheral smear in order to assess plaintiff's past and present condition. When plaintiff was first diagnosed in 1993, she had experienced and was experiencing dramatic and unpredictable drops in her blood platelet counts. After approximately 3 years of prednisone (steroid) treatment, her platelet counts stabilized at a sub-normal level. Her platelet counts have remained sub-normal, which leads Dr. Cook to conclude that she still has ITP.

Dr. Cook has treated and managed over 100 cases of ITP. Based on that experience, he has acquired pertinent knowledge of the disorder. He indicates that patients with an ITP history similar to plaintiff's have a 1–in–3 chance that, at some point in the future, they will again experience a drop in platelet levels to a point at which spontaneous bleeding can occur. The risk of spontaneous bleeding arises when the platelet count drops below 20,000. When spontaneous bleeding does occur, the patient is at risk of death due either to shock resulting from external or abdominal bleeding or due to bleeding into the cranial cavity. In the case of bleeding into the cranial cavity, the mortality rate is approximately 50%. Once a patient's platelet levels have stabilized, as is the case with plaintiff, treating physicians are not in a position to notice a drop in platelet levels until the next scheduled appointment, which are typically scheduled every three months. In addition, a treating physician may become aware of a platelet drop when the patient notes unusual bleeding and makes an unscheduled visit. When a stabilized ITP patient does experience a platelet drop, it frequently occurs abruptly, over a three to four week period.

Dr. Cannon, plaintiff's treating physician, has advised plaintiff that ITP puts her at a heightened risk of internal and

external bleeding. He advised plaintiff that she should not drink alcohol or take aspirin because of her condition. Dr. Cannon has advised plaintiff that she should not use heavy machinery or sharp instruments because of the greater risk presented by ITP. Consequently, plaintiff avoids using a knife to prepare food and avoids sewing with a sewing machine. Plaintiff believes, however, that she could perform professional duties requiring the use of a sewing machine. Additionally, plaintiff's brother indicated that he has observed her using a knife to prepare food and other household tasks.

Dr. Cannon also advised plaintiff that travel by car could be dangerous because any accident would carry a higher risk for her than for a person without ITP. He thus advised that she avoid driving whenever possible. Plaintiff indicates that she avoids traveling alone outside the town limits of her hometown, Winfield, Kansas. Dr. Cannon also generally advised plaintiff to avoid any conduct or activities which might cause her to bleed or bruise. In response, plaintiff has restrained from pruning and trimming the plants in her garden because of the sharp tools needed for these tasks; she does not play with her dog in the manner she previously enjoyed due to the risk of an inadvertent scratch or bite; and plaintiff avoids developing romantic relationships with men because intercourse poses a heightened risk of internal bleeding.

Plaintiff, in response to defendants' motion for summary judgment, introduces further expert testimony to which defendants object for the same reasons discussed above. The experts are Wilbur Swearingin, an occupational rehabilitation expert, and Dr. Randall Chambers, an expert in ergonomics and human-machine interfaces. Defendants have filed a motion to exclude the testimony of these two experts which the court has yet to consider.

However, the court concludes that it need not rule on the admissibility of this expert opinion for purposes of the present motions because the opinions offered by these experts will not assist plaintiff at the summary judgment stage. Mr. Swearingin concluded that plaintiff's restrictions substantially reduce her access to the labor market in occupations for which she is qualified and that without accommodation, plaintiff would have a difficult time finding employment in her geographic area. The court finds, for purposes of summary judgment, that it is uncontroverted that plaintiff's restrictions will reduce her access to jobs, especially without accommodations. Because this fact is sufficiently obvious for present purposes, Swearingin's testimony is unnecessary. Dr. Chambers testified that many of the positions at the Winfield plants do not require knife use and that there were some stations that plaintiff could work at with no modification and that other stations could be easily modified to fit plaintiff's restrictions. Chambers' testimony is unnecessary at this stage because the court has already determined that the number of positions at which plaintiff could work, with or without reasonable accommodation, is an open issue. In fact, as noted, the number of positions that do not require knife use at all remains an open issue. The testimony of one expert does not establish an uncontroverted fact. Thus, plaintiff will be no better off with the inclusion of Chambers' testimony at this summary judgment stage.

An important issue in this case is when Rubbermaid became aware of plaintiff's restrictions resulting from the ITP. Plaintiff did receive written restrictions from Dr. Cannon outlining much of the information laid out above, including that plaintiff was not to use any sharp tools. Janice Marr testified that the restrictions were given to plaintiff's immediate supervisor and placed in her production file in April

1995, but that the human resource department did not learn of the restrictions until January 1999. Marr Deposition, Defendants' Exhibit 9, at 14. Marr thus testified that, as of January, 1999, she had not seen any proof of plaintiff's no-knife-use restriction. The restrictions were given to Marr, in January 1999, by Lee Ann Cassiday, another of plaintiff's supervisors in January 1999. However, Cassiday testified that the restrictions were dated April 1993. Cassiday Deposition, Plaintiff's Exhibit K, at 15. Additionally, Marr testified that Rubbermaid could have known of the restrictions prior to April 1995 and that Rubbermaid became aware when plaintiff gave the restrictions to her immediate supervisor. Marr Deposition, Plaintiff's Exhibit M, at 5–6. Also interesting is the testimony of Deanna Tannehill, yet another of plaintiff's supervisors. Tannehill testified that when plaintiff came into her area, plaintiff's prior supervisor, Don Wilson, informed her of plaintiff's no-knife-use restriction and explained the reason for the restriction. Tannehill Deposition, Plaintiff's Exhibit O, at 7. While Tannehill could not remember the exact time that plaintiff began working for her, Tannehill is listed as plaintiff's supervisor on an employee review dated October 20, 1994. *Id.* at 9. This clearly suggests that Tannehill was plaintiff's supervisor prior to April 1995 and that supervisory staff at Rubbermaid were aware of the restrictions prior to January 1995. At the very least, this question remains an open issue of fact.

### F. Plaintiff's Positions and Machine 104

At whatever point in time plaintiff presented her ITP-related restrictions to her supervisor, she was allowed to limit her rotation between various machines. In fact, plaintiff herself testified that, in January 1999, she was allowed to work at just one machine, machine number 104. Plaintiff's Deposition, Defendants' Exhibit 4, at

241. She further testified that she did not rotate from machine to machine. *Id.* at 243. Plaintiff's position on machine number 104 did not require cutting or overhead lifting. It was a sitting position. Machine 104 manufactured small parts, such as cooler handles. The handles would come down a conveyor belt, and the employee's job was to place the handles into a box.

Despite plaintiff's seemingly unambiguous statement that she worked only on 104, there is contradictory evidence from her supervisors on that point. Lee Ann Cassiday indicated that during 1999, plaintiff was often assigned to machine number 109. Cassiday Deposition, Plaintiff's Exhibit H, at 13. Yet another supervisor, Richard Martinez, indicated that plaintiff was not limited to one machine. While the time line is not clear, Martinez clearly referenced the no-knife restriction and indicated that plaintiff primarily worked 104, but also machines 109 and 110, "quite often." Martinez Deposition, Plaintiff's Exhibit A, at 6. The reference to the no-knife restriction makes the time under discussion relevant even if he didn't specifically indicate a date. He also indicated that she possibly worked on machine numbers 105, 107, 118, and 119. To the extent that plaintiff did remain on the 104 position without rotating, other production workers were precluded from rotating to that position.

Although there were other production workers who could not rotate to every position, Marr does not know of any other production worker assigned to one machine and not required to rotate. Nor was plaintiff aware of any other employee who was allowed to work at just one machine. In fact, plaintiff testified that the other employees rotated from one position to another every hour, but that she did not rotate with them. Clearly, an issue re-

mains as to the extent to which plaintiff worked solely on 104. The court recognizes the apparent clarity of plaintiff's statements, but also notes an apparent inability on plaintiff's part to fully grasp the questions that were put to her through an interpreter. Given that her supervisors all suggested that she worked, at least to some small degree, on other machines, the court cannot conclude that 104 was the sole machine on which plaintiff worked after the no-knife restrictions were put in place. Plaintiff did indicate that "she did not know" of any other machines that fit her restrictions. Plaintiff's Deposition, Defendants' Exhibit 4, at 321. But again, the court cannot conclude that no other machines fit within her restrictions given the testimony of the various supervisors to the contrary. Incidentally, machine 104 was replaced in mid–1999, but the replacement machine had roughly the same operator tasks as the previous model.

The court does note that, with the exception of one review in March 1996, plaintiff usually received performance ratings of average, good, or acceptable. Ms. Marr admitted that plaintiff "satisfactorily performed" the tasks she was assigned even during the period from December 1998 through January 1999. Additionally, Mr. Martinez testified that plaintiff did the work she was assigned during the last few months she worked at the Winfield plants. During the same period, Ms. Cassiday testified that she had no trouble with plaintiff's work performance and that plaintiff was an average employee.

### G. Plaintiff's Removal from Active Work

Defendant Marr testified that the fact that plaintiff was left in her position from at least April 1995 (potentially earlier depending on when plaintiff provided the no-knife restrictions to her supervisor) to January 1999 was an oversight on the part of Rubbermaid. Defendants contend that the oversight was discovered in December 1998 when an employee complained of plaintiff not being required to rotate. See Marr Deposition, Defendants' Exhibit 5, at 285. The complaining employee did suggest that plaintiff not being required to rotate was unfair and a show of favoritism, preventing others in plaintiff's rotation cell from being able to work in the less demanding position. After the complaint, Marr investigated and learned that plaintiff had worked on machine 104 and, at least at times, was not required to rotate. Marr further discovered that plaintiff's human resource file did not contain any notation of a no-knife restriction. After further inquiry, Marr learned that plaintiff's production floor file contained a copy of the restrictions which Marr indicated were dated April 1995 (although the court has previously noted some discrepancy as to the April 1995 date).

Given the no-knife restriction, Marr indicated her belief that plaintiff would be excluded from approximately 70% of the positions at the Winfield plants. As noted previously, other Rubbermaid supervisors have estimated that plaintiff would be excluded from fewer than 50% of the available machines, thus creating a fact issue. Plaintiff did testify, however, that she did not know of any other employee who did not use a knife and that she thought every employee used a knife. As a result of Marr's investigating plaintiff's situation, a meeting was held on or about January 13, 1999. The meeting was attended by plaintiff, Ms. Marr, Somsy Sengvixay (as plaintiff's interpreter) and other supervisors. During the meeting, Marr asked plaintiff to go home and get updated restrictions from her doctor within two weeks. At the time of the meeting, Marr had already reached her opinion that the no-knife use restriction would exclude plaintiff from more than 50% of the available production worker positions at the Winfield plants.

After the meeting, plaintiff told her brother that she did not think she could "keep the heavy job" at Rubbermaid and that Rubbermaid had sent her to go to the doctor. Plaintiff, accompanied by her brother, did see her doctor the next day. Plaintiff told her doctor (through her brother) that Rubbermaid wanted to know her present condition. Plaintiff's brother did not talk to Dr. Cannon about the cut-resistant equipment utilized by Rubbermaid. He did not think that it was the doctor's responsibility to protect plaintiff at work. Plaintiff asked her brother to request that Dr. Cannon write a note indicating her current restrictions. According to plaintiff, the resulting note recommended that plaintiff not return to work. Plaintiff obtained the note approximately three days after the appointment and took the note to Debbie Littrell. Plaintiff indicated that since the meeting she had been working on machine 104, but that upon Littrell's receipt of Cannon's letter on January 25, 1999, Littrell told her to stop work. That was plaintiff's last day of work at Rubbermaid.

Plaintiff was placed on leave of absence beginning January 27, 1999. This leave of absence was instituted because plaintiff had exhausted the maximum twenty-four week temporary light duty available under Rubbermaid's restrictive duty program. This introduces some confusion. The twenty-four week light duty assignment portion of the restrictive duty program applies only to employees with temporary restrictions. Conversely, a 50% rule is triggered only after Rubbermaid determines that a medical restriction is permanent. Accordingly, Rubbermaid's treatment of plaintiff suggests that the company believed that her restrictions were temporary. However, Marr testified and the record tends to reflect that Rubbermaid was aware that plaintiff's restrictions were permanent prior to the time plaintiff was placed on leave of absence.

*See* Marr Deposition, Plaintiff's Exhibit I, at 2. To clarify, the court finds it uncontroverted that Marr knew plaintiff's restrictions were permanent at least by the time plaintiff was placed on leave of absence. In the end, Marr did indicate that plaintiff was terminated because she could not operate 50% of the available positions at the Wheatfield plants. Defendants contend that plaintiff was, in fact, treated more favorably than was otherwise required by the restrictive duty program. This is true to the extent that a person with a permanent restriction who could not pass the 50% standard was terminated immediately and was not entitled to the one year leave of absence. Thus, plaintiff, assuming Rubbermaid knew the restriction was permanent in January 1999 (as the record suggests), was given a leave of absence which was not required under the policy. However, plaintiff notes that a worker found to have a permanent restriction was entitled to a walk-around to determine whether that worker complied with the 50% standard. In this case, plaintiff contends that Marr made a determination herself that plaintiff failed the 50% test without following the walk-around procedure and that plaintiff was thus treated less favorably than other workers with permanent restrictions.

At the end of the one-year leave of absence, on January 27, 2000, plaintiff's employment was terminated. At that time, plaintiff received a letter, signed by Cynthia Konrath indicating this fact. Plaintiff contends that she may have been terminated in January, 1999. She cites a December 30, 1999 e-mail message to Ms. Littrell, wherein Marr states:

> We do have a policy where each associate must perform 50% of all the positions available throughout the company or have their employment terminated.... In Khammoung's case, I feel due to her permanent restrictions and no

knife use, there would be hardly any machines she can do (drastically less than the required 50%) and that is why she is not working and hasn't been for a year now, is because we cannot accommodate her.

Plaintiff's Exhibit E, at 17. The court concludes that plaintiff has not established a fact issue on this point. It is clear to the court that plaintiff was placed on leave of absence in January 1999 and was terminated one year later in January 2000. The noted e-mail is consistent with this conclusion. Plaintiff is not aware of any other employee who was allowed a leave of absence greater than one year. Several other employees lost their jobs as a result of an inability to comply with the restrictive duty policy. Similarly, other employees were terminated at the end of a one-year leave of absence.

## H. Plaintiff's Disability Claims

In 1999, plaintiff applied for, and received, short-term disability benefits. Plaintiff had also previously applied for short-term disability. Her brother, Ron Southammavong, helped her with that previous application. Similarly, he had some involvement in her recent application. He attended a meeting with plaintiff and Littrell after plaintiff was placed on leave of absence in January 1999. Southammavong asked how plaintiff would have any income if she was off work and asked if the company would offer her any short term benefits. Southammavong indicated that Littrell told him that short-term disability was a benefit the company provided for its employees and that it might be available for plaintiff. Littrell did not tell plaintiff's brother that plaintiff was required to apply for short-term disability but only mentioned the possible availability of the benefit. Littrell gave Southammavong the initial idea, but did not tell him that plaintiff had to seek short-term disability. Littrell did, however, indicate that such an applica-

tion would be appropriate and assisted plaintiff and Southammavong in filling out part of the necessary form, including instructing plaintiff to indicate that she was "totally disabled." *See* Southammavong Deposition, Plaintiff's Exhibit R, at 6. Plaintiff, on the other hand, did not indicate that Littrell offered any assistance in filling out the short-term disability application. After receiving the form from Littrell, plaintiff indicated that she took it home to complete. Plaintiff indicated she understood the form and filled it out with her brother's help, and clearly, the signed form did indicate that she was claiming a total disability.

Plaintiff understood that the short-term disability would continue for only six months and she marked her calendar reflecting when the period began. Plaintiff received $109/week by check. Plaintiff indicated that she spent the money and did not tell anyone that she believed she should not be on short-term disability. During the six months plaintiff received short-term disability, she never told anyone she wanted to return to work. In fact, she did not communicate with Rubbermaid at all during the time she was receiving the payments. Either shortly after or just prior to the expiration of plaintiff's benefits, Littrell received a communication on plaintiff's behalf requesting that plaintiff be allowed to return to work. Then, plaintiff and her son met with Littrell. The son said that plaintiff had been working successfully on machine 104 when she was told to go home and he didn't understand why she would not be allowed to return to that position.

During the same time period, plaintiff's brother met with Littrell asking whether plaintiff could return to work or how to otherwise proceed. Littrell provided plaintiff's brother with forms so that plaintiff could apply for long-term disability.

Rubbermaid's long-term disability program is administered by CNA Insurance Company ("CNA"). According to plaintiff, Littrell gave her the forms on or about September 9, 1999. Littrell informed her she should fill out the application for long term benefits once the short-term was exhausted. Plaintiff took the form to Dr. Cannon who indicated that plaintiff ·was unable to perform either her job or any other work. Further, a check mark on the long-term disability form indicated that plaintiff was "totally disabled." Although plaintiff recognized her signature on the form, she could not remember the form or who put the mark indicating total disability. Her brother did, however, explain and translate the form before she signed it.

Plaintiff spoke with Littrell on December 24, 1999, and told her that she had not received an answer on her long-term disability application. Littrell advised plaintiff that she would check into the application and get back to plaintiff with the results. Littrell then received a phone call from a CNA representative advising that CNA intended to deny the request. In order to help plaintiff and help·CNA understand the situation, Littrell agreed to talk with a Rubbermaid safety manager and type up a document clarifying the situation. She did, in fact, create a document explaining the job of a production worker. She wanted CNA to have a thorough understanding of the position in reaching its benefit decision. Sometime in December 1999, plaintiff learned her application for long-term disability had been denied. Plaintiff received a letter from CNA to that effect. Littrell recalls meeting with plaintiff and her brother and indicating that plaintiff could not return to work as long as she had a permanent restriction prohibiting knife use.

Plaintiff also applied for Social Security disability benefits. The statement plaintiff submitted to the Social Security Administration states that plaintiff became unable to work due to a disabling condition on January 25, 1999. Plaintiff's daughter, Angel Praseuth, assisted plaintiff in applying for Social Security benefits. The disability application was denied. Although plaintiff does not know whether she represented to Social Security that she was entirely unable to do any work, she indicated that she and Angel discussed what should be said in the application.

Because plaintiff's ability to speak, read, and write English is limited, she relied heavily upon her daughter's assistance when she applied for Social Security disability benefits. Angel Praseuth has communicated with her mother in the Laotian language throughout her life. Angel currently resides in California, but she returned to Winfield in late January 2000 for several days to provide whatever help she could to her mother. The visit was initiated because plaintiff had learned that Rubbermaid was in the process of terminating her employment. Angel took plaintiff to the Social Security office in Winfield to see if she might qualify for benefits. Angel thought her mother might qualify for disability benefits because she had been labeled disabled in the past and because she believed that Rubbermaid was terminating plaintiff because of her medical conditions. This led Angel to believe that Rubbermaid considered her mother to be disabled. Angel also knew that her mother had applied for and received short term disability benefits from Rubbermaid. And Angel had been told by Littrell that plaintiff should qualify for long term disability benefits. Further, Littrell told Angel that Rubbermaid could not accommodate plaintiff. Based on the foregoing, Angel concluded that plaintiff might qualify for Social Security disability coverage and thus helped her fill out the paperwork to see if she would qualify for those benefits. As far as Angel knows, she is the

only person who helped plaintiff apply for the benefits. In any event, Angel advised her mother it was acceptable to sign the documents representing that she was "unable to work because of [a] disabling condition" and that she was "still disabled." Angel asserts that in her mind the statements were accurate since plaintiff could not return to work at Rubbermaid given the medical restrictions. Both Angel Praseuth and plaintiff indicate that they did not attempt to purposely misstate facts about her condition or her ability to work in her effort to acquire benefits. Plaintiff notes that she also filed a document with Social Security providing detailed information about her condition and her ability to work, including an accurate description of her medical condition, the circumstances which resulted in her loss of employment, her failed efforts to return to work, and her current employment status.

## I. Additional Facts Relating to Plaintiff's Ability to Work at Rubbermaid

While plaintiff indicated that "everyone" at Rubbermaid used a knife at work, other employees indicated that there are an unknown number of positions at the Wheatfield plants which do not require knife use. Additionally, some positions allow a worker to select between hammer or knife use. It is uncontroverted that Rubbermaid does provide protective equipment to those using knives. Plaintiff is not aware of any protective equipment other than that provided by Rubbermaid which would provide additional protection.

Like plaintiff's son, plaintiff's brother also met with Littrell on a number of occasions to discuss plaintiff's return to Rubbermaid. Defendants assert, at SOF 95, that plaintiff would only return to work if she could work on machine 104. Littrell Deposition, Defendants' Exhibit 3, at 101–107. The court concludes, after reading Littrell's remarks regarding both plain-

tiff's brother and son *in toto*, that Littrell's testimony does not support plaintiff's assertion. While the testimony is somewhat unclear at certain points, the conclusion in each instance is that the brother and son were simply inquiring as to why plaintiff could not return to machine 104 since she had been successfully working on that machine. They were not demanding that plaintiff be returned to 104 exclusively. The court recognizes that Littrell does indicate, such as at page 103, ll. 23–25 that a demand was made that plaintiff be returned to the same position. But at page 101, ll. 20—page 102, ll.2, Littrell gives a clearer picture which the court accepts. See also page 107, ll. 8–16. In short, the court cannot find it an uncontroverted fact that plaintiff, through either her brother or son, demanded to be returned to only one machine.

Plaintiff did tell her brother that there were many things she could do at Rubbermaid, but did not provide any specifics. Angel Praseuth spoke with Littrell on January 19, 2000. She asked Littrell whether there was any accommodation Rubbermaid could make for plaintiff. She did not, however, suggest any specific accommodations. On February 2, 2000, plaintiff sent a letter to Rubbermaid asking to be allowed to return to work and requesting reasonable accommodations so that she could work safely. The letter was signed by Angel Praseuth on behalf of her mother and was prepared by plaintiff's counsel's office. The letter was specifically sent to defendant Denton, Rubbermaid's general manager, and Rubbermaid's director of human resources. The letter was actually received by Cynthia Konrath, who forwarded the letter to Rubbermaid's in-house counsel for response. No response was provided. Additionally, plaintiff and her son spoke with Debbie Littrell on January 21, 2000. This is the conversation where plaintiff's son questioned Littrell about machine

104 and wanted to know why plaintiff wouldn't be able to return to work in that position. Littrell explained that everyone at Rubbermaid works with knives and plaintiff's restrictions could not be accommodated. The court again notes that some of the record suggests that there are positions at Rubbermaid which do not require knife use.

At defendants' SOF 100, defendants state that allowing plaintiff to work on only machine 104 would cause undue hardship because Rubbermaid's policies were not being applied consistently, there was an increased risk of injury absent rotation, and employees suffered morale problems when they were not permitted to rotate to the less demanding positions offered by machine 104. It is uncontroverted that defendant Marr so testified. It is also uncontroverted that machine 104 was replaced in February of 1999. The relevance of this fact statement seems a bit dubious for several reasons. First, the myopic focus on machine 104 seems somewhat misplaced if, in fact, there are a number of other positions that would accommodate a no-knife use restriction. Second, it appears the removal of machine 104 is largely irrelevant since at least one supervisor indicated that the replacement has essentially the same positions. Further, the fact of morale problems is not uncontroverted. The supervisor of the cell of which machine 104 was a part testified that he was able to structure the cell rotation so that plaintiff's doing only rework and working on the one machine did not make it more difficult for the other employees in the cell. Wilson Deposition, Plaintiff's Exhibit N, at 3–4. Finally, the defendant cannot reach a conclusion that undue hardship exists as a statement of fact and the court will not accept such a conclusion as a factual characterization.

Plaintiff indicated she did not know of any other employee who did not use a knife. However, she also testified that, even with the no-knife use restriction, she was able to perform the regular job of a production worker at the Wheat Road plant. In fact, she did act as a production worker with a no-knife use restriction between 1995 and 1999. Littrell indicated that she did not know if anyone checked to see if there were positions outside production, such as in the warehouse, where plaintiff could work within her restrictions. Marr testified that she mentally reviewed the positions in each of the cells of the Winfield plants to determine how many positions plaintiff might be able to perform. She assumed that plaintiff would have been required to use a knife at each position (she does not mention hammer use options) and that plaintiff would have to rotate throughout the production cells. Marr testified that there was no formal walk-around done for plaintiff's permanent restriction because it "took away the major functions of producing the product that she was hired for," so the study would not be relevant. As the court has previously noted, other Rubbermaid employees have indicated that well over 50% of the positions at the Winfield plants could be performed without knife use.

### J. Facts Pertaining to Defendant's Mitigation of Damages Argument

Since being placed on leave of absence in January 1999, plaintiff has not attempted to get any training to perform any other kind of work. As of December 6, 2000 (date of deposition), plaintiff had not had any job interviews since she was terminated by Rubbermaid. From January 27, 2000 to her deposition, plaintiff indicates that she looked through the Winfield paper's want ads 200 times searching for a job. She never applied for any of the jobs advertised because of the low wages. Plaintiff has not read the want ads in the Wichita paper in her attempt to find a new

job. Plaintiff has, however, been to the Kansas Job Service Center to view their list of available jobs. At the time of her deposition, plaintiff could not articulate any plans to seek employment in the future. She did, however, provide a declaration that she has made numerous attempts to find a job in 2000, 2001, and 2002, although she has yet to receive an interview.

### K. Facts Pertaining to Plaintiff's Claims Against Individual Defendants

Defendant Denton testified that he had no knowledge of plaintiff or the position she worked in prior to 1999. While he was president of Rubbermaid Home Products Division in 1999 and 2000, Denton was unaware of any policy requiring that production workers be able to work at 50% of the work stations in any given facility. Similarly, Denton was not aware that plaintiff was told she must comply with this standard in order to retain her position. Plaintiff was not personally aware of Denton's position, but indicated that Denton's failure to respond to her written request for reinstatement with accommodation was wrongful. Plaintiff has never had a conversation with Cynthia Konrath and does not know why she was named a defendant in this lawsuit. Angel Praseuth had discussions with her mother as to why Littrell was involved in the lawsuit, and concluded that it was essentially because her position as a primary contact made her responsible. In regard to her role as a primary contact, Littrell never refused to answer any questions that plaintiff's brother asked. In fact, Littrell always helped plaintiff's brother whenever he requested assistance. Finally, plaintiff has not spoken to Marr since the January 13, 1999 meeting when plaintiff was told to leave and get updated restrictions.

### L. Facts Pertaining to Newell–Rubbermaid's Position as Defendant

The Winfield Rubbermaid facilities had a plant manager who reported to the Vice President of Operations of Rubbermaid Home Products who reported directly to defendant Denton, the President of the company. Denton reported to the CEO of Rubbermaid, Inc. who in turn reported to the board of directors for Newell–Rubbermaid, Inc. After Newell–Rubbermaid merged in March of 1999, efforts were made to make Rubbermaid more profitable, to make the factories more efficient, to upgrade equipment, and to assess and improve the distribution network, among other things. The term "Newellization" was coined to reference this process. Essentially, "Newellization" is an ongoing process by which Newell–Rubbermaid tightens the finances of the new company, improves customer service and marketing, exercises financial controls over the subsidiary, reduces inventories and improves operational efficiency. Mr. Marotti testified that "Newellization" amounts to taking control of the newly acquired company and modifying the way it does business to make it more profitable. In his opinion, Rubbermaid was and is undergoing the "Newellization" process. After the merger in March 1999, Rubbermaid, Inc. continued in existence and maintained its headquarters in Wooster, Ohio. Newell–Rubbermaid has a separate headquarters in Freeport, Illinois.

Littrell testified she has received documents indicating that her employer was Newell–Rubbermaid. The documents include paychecks, pay stubs and W–2 forms. The documents began indicating that Newell–Rubbermaid was the employer in about mid–1999. This was, of course, approximately the time of the merger. Littrell did not observe an unusual number of changes in the way the Winfield facili-

ties were operated following the merger. Nor were there a significant number of changes in management personnel. This is not to say, however, that "Newellization" was not occurring. Marr testified that the "actual name" of her employer was Rubbermaid Home Products. However, she notes that her pay stubs began noting Newell–Rubbermaid as her employer in the 1999 time frame. It is uncontroverted that Newell–Rubbermaid exercised control over the payroll for workers at the Winfield facilities. Further, Newell–Rubbermaid prepared employee newsletters, and provided benefits and retirement programs for the workers at the Winfield facilities.

It is also uncontroverted that former Newell, Inc. managers have been transferred among various subsidiaries, including Rubbermaid, in the "Newellization" process. At least in Ms. Konrath's case, the job duties of managers assigned to the various subsidiaries are determined by Newell–Rubbermaid. While Konrath was human resource manager at the Winfield plants, her job duties were described on a Newell Company document. The same document had described her job duties in her prior job, when she was assigned to a different Newell–Rubbermaid subsidiary. Konrath's role in transferring from a Newell Company position to the position at the Winfield facilities included instilling the Newell Company "corporate culture" in the newly-acquired subsidiary of Newell–Rubbermaid. The Newell–Rubbermaid goal was to create a "nimble giant" by instilling the 15 commandments of corporate culture in the managers of all its divisions. Accordingly, Konrath did such things as training Rubbermaid managers on the Newell–Rubbermaid performance evaluation system for salaried employees, and streamlining paperwork for processing wage increase requests for hourly employees. Konrath reported to Scott Koenig, director of human resources at Rubbermaid Home Products, who reported to Joe Marotti.

At least some of Rubbermaid's officers report directly to Newell–Rubbermaid rather than the Rubbermaid board of directors. For example, Joe Marotti, a Rubbermaid Home Products employee, reported to the executive vice president of human resources for Newell–Rubbermaid. He also reported to Rubbermaid's president. As noted above, it is also uncontroverted that the CEO of Rubbermaid reported directly to the board of directors of Newell–Rubbermaid.

## M. Facts Pertaining to Plaintiff's Breach of Contract Claim

While working at Rubbermaid, plaintiff received two or three employee handbooks. She signed a document in 1991 acknowledging receipt of an employee handbook. The handbook states that "all associates are hired on an at will basis, consequently, this handbook does not constitute a contract of employment or create an contractual rights in favor of the Company or any of its associates." 1991 Employee Handbook, Defendants' Exhibit 21, at 7. Plaintiff never had anyone translate any of the information from the handbook and she does not recall the statement in her employee handbook. However, she does not recall that anyone at Rubbermaid ever told her she had a contract with the company. Plaintiff initially testified that no one at Rubbermaid told her she would be employed for a specific amount of time or that she could be terminated for misconduct. Plaintiff did, however, correct her deposition by noting that Vaughn Burkholder, an attorney representing Rubbermaid in a 1992 workers compensation claim asserted by plaintiff, told her that she could only be fired for excessive tardiness or absences.

Rubbermaid made an effort to insure that employees complied with the provisions of the employee handbook. Employees could be disciplined for failing to comply with its requirements. Littrell testified that she was not aware of anything in the handbook that Rubbermaid did not follow. The human resource department makes sure that policies and procedures are followed and applied consistently to employees with respect to termination decisions. To the best of Marr's knowledge, Rubbermaid attempts to apply the provisions of the employee handbook to the employer/employee relationship with all associates.

### N. Facts Pertaining to Plaintiff's Fraud Claims

Plaintiff does not know that anyone at Rubbermaid lied to her and cannot identify anything that was told to her that she thinks is a lie. Similarly, she does not know anything that anyone at Rubbermaid said to her that she believes to be false or that she suffered harm by relying upon. After January 25, 1999, no one at Rubbermaid ever told plaintiff they were planning to bring her back to work.

Plaintiff does, however, assert that Littrell knew in January 1999 that plaintiff would not be returning to work because of the knife use restriction. Littrell Deposition, Defendants' Exhibit 3, at 93–94. Defendants advance an alternative interpretation of Littrell's testimony and provide an affidavit of Littrell to support the interpretation. *See* Littrell Affidavit, attached to Defendants' Supplemental Reply. The court concludes that Littrell did not know in January 1999 that plaintiff would not be returning. Instead, the testimony at issue indicates Littrell's confirmation that a meeting occurred in January 1999. The court further notes that plaintiff was allowed to take a one-year leave of absence and received six months of short term disability payments. These are both bene-

fits which were only available to Rubbermaid employees. the court thus concludes that in the minds of Littrell and other Rubbermaid representatives, plaintiff was still an employee until January 2000.

### O. Facts Pertaining to Plaintiff's Invasion of Privacy Claims

Littrell did not tell any of the employees on the production floor that plaintiff had a blood disorder. Littrell has never heard that employees on the production floor were instructed to keep an eye on plaintiff because she had some type of problems and to advise supervisors if she started to act funny or look sick. No one ever told Littrell why plaintiff wasn't supposed to be using knives; she was only informed of the existence of the restriction itself. Plaintiff's brother, who lives and works in Winfield and speaks fluent English, is not aware of anyone in the community of Winfield discussing plaintiff's medical conditions. No one ever told Southammavong that Janice Marr, Cynthia Konrath or Debbie Littrell told them about plaintiff's medical condition. Likewise, plaintiff never told her brother that she heard anybody in public talking about her medical condition. Plaintiff's brother does not know who told plaintiff that her medical information was shared among hundreds of Rubbermaid employees, as alleged in the Amended Complaint. Plaintiff never told her brother that she thought Janice Marr, Cynthia Konrath, Debbie Littrell or Bill Denton had disclosed anything about her medical condition.

While visiting her mother, Angel Praseuth never heard anyone outside the Praseuth family or those involved in this lawsuit talking about her mother's health. Aside from communications with plaintiff's counsel, Angel has no factual basis on which to conclude that anyone in Rubbermaid management disseminated informa-

tion about her mother's health condition. Angel Praseuth has no knowledge that Littrell ever spoke with anyone who was not in a position of needing to know about her mother's health condition. Likewise, Angel has no evidence suggesting that Janice Marr talked to anyone not in a such a position concerning plaintiff's condition. The same can be said for Cynthia Konrath. Finally, defendant Denton indicated that he was not even aware of anything concerning plaintiff's ITP. Marr testified that it was the strict policy and practice of the company to keep employee's medical information confidential. Nonetheless, a Norman Johnson, who worked with plaintiff at the Winfield facilities, testified that he had heard from co-workers that plaintiff had some type of blood disorder. He could not identify the source of the information, but indicated that plaintiff's condition was common knowledge on the production floor. He did testify, however, that he was certain he had never heard about plaintiff's condition from any management-level employee. Similarly, plaintiff testified that various non-supervisory employees stopped plaintiff from using knives or would not allow her to use a knife. Plaintiff had not told these employees, or any coworkers, about her bleeding disorder.

Plaintiff's son, Prisken Praseuth, lives in Winfield and has worked at Rubbermaid Home Products for more than ten years. He is fluent in both English and Laotian. He has never heard anyone at the Rubbermaid plant or in Winfield discussing his mother's health condition.

## P. Facts Pertaining to Plaintiff's Claimed Relief and Punitive Damages

Rubbermaid Home Products division of Rubbermaid, Inc., had approximately 5,000 employees in the United States in 1999 and 2000. Defendants knew of plaintiff's musculoskeletal disorder which resulted in the overhead work restriction in 1993 and accommodated that restriction. Defendants knew of plaintiff's no-knife-use restriction at the production floor supervisor level at least as early as April 1995 (when plaintiff's supervisors became aware of the restrictions is not uncontroverted but was at least as early as April 1995). Other managerial employees and human resource personnel did not become aware of the restrictions until much later. Plaintiff asked to return to work, both before and after her official termination. During the period from March 1999 until July 2000, Mr. Denton was president of Rubbermaid Home Products. As such, he was ultimately responsible for the activities taking place within that division. During Ms. Konrath's term as human resource manager, she had authority to implement and administer personnel policies. Defendants were aware of federal laws prohibiting employment discrimination based on a person's disabilities. Denton, Marotti, Konrath, and Marr all testified that they were aware of the need to comply with federal law with respect to plaintiff's employment. Both Denton and Konrath indicated they were aware they might violate federal law if the letters from plaintiff were not handled appropriately and thus recognized that plaintiff's letter requesting to return to work needed to be reviewed by legal counsel. Denton and Konrath do not deny receiving plaintiff's letter. Neither responded to the letter.

In attempting to establish what constituted outrageous conduct on the part of defendants, plaintiff indicated that both terminating her and placing her on leave of absence were outrageous. Plaintiff does not think any of defendants' actions in providing her with forms to apply for disability were outrageous. No one at Rubbermaid ever told plaintiff that she should not file a complaint with the EEOC or that she should delay her filing for any reason. Plaintiff received a bonus check on Decem-

ber 24, 1999, almost one year after her leave of absence began.

Plaintiff has never been hospitalized, medicated or treated for any mental problems. She did testify, however, that she has trouble sleeping, frequently thinks about dying, and worries about paying her bills. Plaintiff testified that Littrell was never mean to her and acted "normal" during conversations with plaintiff. Marr treated plaintiff "normally," not disrespectfully. Plaintiff has never spoken with Konrath.

Plaintiff does not know how long she planned to work at Rubbermaid until retirement. She did not have any definite plans to retire at age 62 or 65. Plaintiff wishes to be reinstated as an employee at Rubbermaid and would like to be reinstated under conditions that are not dangerous to her, i.e., those which accommodate her no-knife use restriction.

## II. Summary Judgment Standard

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party. *Jurasek v. Utah State Hosp.*, 158 F.3d 506, 510 (10th Cir. 1998). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Baker v. Board of Regents*, 991 F.2d 628, 630 (10th Cir.1993). The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. Analysis and Discussion

While plaintiff's motion for summary judgment was filed first in time, the court will consider defendants' motion first. To the extent plaintiff has remaining claims, the court will then consider plaintiff's motion.

### A. Newell–Rubbermaid is not a Proper Defendant

Defendants argue that Newell–Rubbermaid, Inc. is not an appropriate defendant in this matter because it was not plaintiff's employer. Defendants contend that Rubbermaid, Inc. is the sole employer in this case despite the fact that Newell–Rubbermaid and Rubbermaid merged in or about 1999. Plaintiff argues, on the other hand, that Newell–Rubbermaid exercised sufficient control over Rubbermaid in order to subject it to liability as plaintiff's employer.

Depending on the facts of the case before them, courts have applied four different tests to determine whether a parent corporation is liable for the acts of its

subsidiary. The tests include the integrated enterprise test, the agency theory under which the plaintiff must establish that the parent exercised a significant degree of control over the subsidiary's decision-making, the alter ego test which is founded in equity and permits the court to pierce the corporate veil when the court must prevent fraud, illegality or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability from a crime, and the instrumentality test under which the plaintiff must establish that the parent exercises extensive control over the acts of the subsidiary giving rise to the claim of wrongdoing. Both parties argue each of these tests, but tacitly concede, through primary briefing, that the integrated enterprise test best fits the facts currently before the court.[1]

▉▉▉ Under the integrated enterprise test, the following four factors are considered: (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1089 (10th Cir.1991). The first three factors are weighed more heavily than the last. *NLRB v. Welcome-American Fertilizer Co.*, 443 F.2d 19, 21 (9th Cir.1971). It is uncontroverted that Rubbermaid, Inc. was plaintiff's employer and that Newell-Rubbermaid, Inc. is Rubbermaid Inc.'s parent company. The doctrine of limited liability, however, creates a strong presumption that a parent company is not the employer of its subsidiary's employees, and the courts have found otherwise only in extraordinary circumstances. *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 980–81

(4th Cir.1987). To overcome the presumption, plaintiff must establish that defendant Newell-Rubbermaid's control over its subsidiary exceeded that normally exercised by a parent corporation. *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993).

### 1. Interrelation of Operations

▉▉▉ Plaintiff relies on several pieces of evidence of an integrated enterprise: the control that Newell-Rubbermaid exercised over its subsidiaries in the process of "Newellization," the fact that Newell-Rubbermaid issues payroll checks for Rubbermaid employees and provides benefits and retirement programs, the transfer of Ms. Konrath from Newell to Rubbermaid, and the fact that the chain of command ran from Rubbermaid upper management to Newell-Rubbermaid in at least two instances. The court will discuss each of these facts in the appropriate place within the four-factor framework of the integrated enterprise test.

The court concludes that plaintiff has established a limited level of interrelation based primarily on the fact that Newell-Rubbermaid issued paychecks and controlled the benefit and retirement programs offered to the employees of Rubbermaid. Other courts have found that parent control of the subsidiary's payroll and benefits is, with the addition of other factors, sufficient to show interrelation. *See McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933–34 (11th Cir.1987) (parent's operations were interrelated with those of subsidiary when parent kept subsidiary's books, issued its paychecks, and paid its bills); *EEOC v. Financial Assurance, Inc.*, 624 F.Supp. 686,

---

1. To be clear, the court concludes that the alter ego test does not apply to the given facts for lack of an equitable reason to invoke the test. As noted below, the court has rejected plaintiff's fraud claim which would eliminate

any possible ground for an alter ego analysis. The instrumentality and agency tests both focus on control and are thus quite similar to the test being applied by the court.

689–90 (W.D.Mo.1985) (operations interrelated when parent and subsidiary shared services, equipment, employees and office space, and parent controlled subsidiary's payroll and benefit programs).

Plaintiff has not established any other factors relevant to show interrelation. There is no evidence that Newell–Rubbermaid kept Rubbermaid's books, paid its bills, shared services, equipment, employees or office space. In fact, the two companies maintained independent headquarters. Nor is the court persuaded by the fact that Ms. Konrath was transferred from Newell to Rubbermaid. This is not an instance of a shared employee, but a complete reallocation of human resources by a parent company that is trying to instill its operating philosophy on the subsidiary. Such an exercise does not exceed the level of control that normally exists between a parent and subsidiary. Additionally, plaintiff's chain of command arguments are irrelevant as a matter of law. Plaintiff notes that Joe Marotti reports to the executive vice president of human resources at Newell–Rubbermaid and that Denton's chain of command eventually leads to the Newell–Rubbermaid board of directors. Plaintiff asserts that this establishes common management. However, in *Frank*, the Tenth Circuit plainly held that the fact that the chain of command crossed parent subsidiary lines does not evidence anything beyond normal levels of control. *Frank*, 3 F.3d at 1362. "To hold otherwise would mean that there would always be a material factual dispute as to this prong because the top officer of a subsidiary is, at some point, always held accountable to an officer of the parent corporation." *Id.* The court concludes that plaintiff has established a limited degree of interrelation.

### 2. Centralized Control of Labor Relations

In *Frank*, the Tenth Circuit provided the following discussion of this element. Whether the parent controls labor relations is "an important factor" in the four-part integrated enterprise test. *Evans*, 936 F.2d at 1090. The critical question is, "[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?" *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir.1983). A parent's broad general policy statements regarding employment matters are not enough to satisfy this prong. *See Wood v. Southern Bell Tel. & Tel. Co.*, 725 F.Supp. 1244, 1249 (N.D.Ga.1989). To satisfy the control prong, a parent must control the day-to-day employment decisions of the subsidiary. *See Armbruster v. Quinn*, 711 F.2d 1332, 1338 (6th Cir.1983).

In short, plaintiff has failed to establish anything more than the fact that Newell–Rubbermaid provided Rubbermaid with broad policy statements and corporate direction. Clearly, Newell–Rubbermaid attempts to ingrain its corporate philosophy on its subsidiaries through the process known as "Newellization." But this level of control does not rise to the day-to-day level of control over employment decisions which would satisfy this factor. There is no evidence that any Newell–Rubbermaid managers exercised any influence over the employment decisions that were made in plaintiff's case. There is not even any evidence that Newell–Rubbermaid provided Rubbermaid with the restrictive duty policy which eventually led to plaintiff's termination. Even if there were evidence that Newell–Rubbermaid promulgated the policy, this would simply establish the generation of a policy statement and would not evidence day-to-day control over employment decisions. Plaintiff has failed to establish centralized control of labor relations.

### 3. Common Management

Plaintiff has not established any common officers or managers and has thus

failed to establish common management. *See McKenzie*, 834 F.2d at 933–34 (common management found where there was common president, who controlled personnel management of both companies, as well as other common officers); *Financial Assurance*, 624 F.Supp. at 689 (common management found where there was same family, consulting often on business matters, heading both parent and subsidiary).

### 4. Common Ownership

The level of ownership has not been established and thus the court must presume that Newell–Rubbermaid is the sole owner of Rubbermaid. However, this factor, standing alone, carries very little weight and can never be sufficient to establish parent liability. *See Wood*, 725 F.Supp. at 1249 ("mere existence of a parent-subsidiary relationship is not enough to impose liability on the parent").

Considering all of the factors together, the court concludes that Newell–Rubbermaid, Inc. has not exercised any unusual level of control over its subsidiary Rubbermaid, Inc. As such, plaintiff has failed to overcome the strong presumption that Newell–Rubbermaid, Inc. was not plaintiff's employer, and has thus failed to establish a basis for imputing liability to defendant Newell–Rubbermaid, Inc. Defendant Newell–Rubbermaid, Inc. is hereby dismissed from this action.

### B. Plaintiff's ADA Discrimination Claims

The ADA prohibits a covered entity from discriminating against a "qualified individual with a disability" because of the individual's disability with respect to terms, conditions, and privileges of employment. *See* 42 U.S.C. § 12112(a). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such

individual holds or desires." *Pack v. Kmart Corp.*, 166 F.3d 1300, 1302 (10th Cir.1999) (quoting 42 U.S.C. § 12111(8)).

■ To establish a prima facie case under the ADA, plaintiff must demonstrate that (1) she is disabled within the meaning of the ADA; (2) she is qualified, that is, with or without reasonable accommodation, she is able to perform the essential functions of the job; and (3) defendant discriminated against her because of her disability. *See Pack*, 166 F.3d at 1302. If plaintiff establishes a prima facie case, the burden shifts to defendant to offer a legitimate, nondiscriminatory reason for its employment decision. *See Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *EEOC v. Flasher Co.*, 986 F.2d 1312, 1317–19 (10th Cir.1992)). If defendant comes forward with a nondiscriminatory reason for its actions, the burden then shifts back to plaintiff to show "a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual— i.e., unworthy of belief." *Randle*, 69 F.3d at 451. "If the employer admits that the disability played a prominent part in the decision, or the plaintiff has other direct evidence of discrimination based on disability, the burden-shifting framework may be unnecessary and inappropriate." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 n. 3 (10th Cir.1997).

### 1. Plaintiff's Disability Remains a Question of Fact

■ The first step in the analysis of plaintiff's claims, then, is to consider whether plaintiff can establish that she is disabled within the meaning of the ADA. " 'Disability' under the ADA is a term of art." *Poindexter v. Atchison, Topeka and Santa Fe Railway Co.*, 168 F.3d 1228, 1230 (10th Cir.1999). While there are three

statutory ways to establish disability, plaintiff has chosen to focus on showing that she has "a physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2). Analysis of whether a "disability" exists proceeds in three steps. *See Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998); *Poindexter,* 168 F.3d at 1230. First, the court must determine whether plaintiff has an impairment. Second, the court must identify the life activities upon which plaintiff relies and determine whether they constitute major life activities under the ADA. Finally, the court must determine whether the impairment "substantially limits" these major life activities.

In construing the ADA provisions, the Supreme Court has relied upon regulations interpreting both the ADA and the Rehabilitation Act of 1973. *See Bragdon,* 118 S.Ct. at 2202–05. When the Department of Health and Human Services issued regulations defining impairment under the ADA, it adopted the Rehabilitation Act regulations. Under those regulations, a physical or mental impairment is:

> (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine; or
>
> (2) Any mental or physical disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h) (1998). In 1993, plaintiff was diagnosed with ITP, a blood disorder. Plaintiff has in the past and potentially may in the future experience unpredictable and dramatic drops in her blood platelet count. Plaintiff's platelet count, on a day to day basis, remains below normal. As such, even when performing routine day-to-day activities, plaintiff is at risk due to the possibility of excessive bleeding and hemorrhaging. If plaintiff experiences another dramatic drop in platelet count, she is at risk of spontaneous internal hemorrhaging which could lead to death or brain damage. ITP clearly falls within the category of disorder affecting the hemic and lymphatic body systems. As such, the court concludes that ITP constitutes an impairment.

Next, the court must identify the life activities which plaintiff claims have been impacted by her impairments and determine whether they are major life activities. "Major life activities" are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Plaintiff claims that her impairments limit seven life activities: lifting, reaching, traveling, sleeping, sex, performing manual tasks, and working. Initially, the court will focus the inquiry. Plaintiff seems to be including her lifting and reaching restriction in the analysis. However, it is uncontroverted that defendants have accommodated her lifting restrictions and "grandfathered in" those restrictions under Rubbermaid's restrictive duty policy. Thus, plaintiff cannot establish that she was discriminated against on the basis of her earlier lifting restrictions. Her claim must be based solely on the ITP related restrictions and the court will analyze her claim with that in mind. Thus, the court will consider the life activities of traveling, sex, performing manual tasks and working.[2] As they are specifically

---

**2.** Plaintiff's lifting, reaching, and sleeping complaints all stem from plaintiff's back, neck, and shoulder problems.

named in the regulations, working and performing manual tasks are clearly major life activities. Further, sexual intercourse and reproduction are recognized as major life activities. *Bragdon v. Abbott,* 524 U.S. 624, 638, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).[3] Although the Second Circuit has concluded that driving is not the type of endeavor that may be characterized as a major life activity, *see Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 643 (2d Cir.1998), the court need not reach that issue.

The final step in the analysis is to determine whether plaintiff's impairment substantially limits her major life activities of sexual intercourse, working and performing manual tasks. The term "substantially limited" means:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). Whether an individual is substantially limited in a major life activity is determined in light of:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2). The Supreme Court has recently noted that the phrase

"substantially limits" suggests "considerable" or "to a large degree." *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 691, 151 L.Ed.2d 615 (2002).

With respect to the impact on plaintiff's ability to perform manual tasks, the manual tasks in question must be central to daily life. "If each of the tasks included in the major life activity of performing manual tasks does not independently qualify as a major life activity, then together they must do so." *Id.* "[T]o be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long-term." *Id.* Further, "the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." *Id.* at 693. "[H]ousehold chores, bathing, and brushing one's teeth are among the types of manual tasks of central importance to people's daily lives." *Id.* In plaintiff's case, the impact will likely remain for the rest of her life. Thus, the only inquiry is whether, in the aggregate, plaintiff's inability to perform various tasks would constitute a severe restriction on activities that are of central importance to most people's daily lives.

Plaintiff claims that because of the ITP condition, she is unable to drink alcohol or take aspirin, she must avoid using a sewing machine and avoid using knives to prepare meals or for any other tasks. Additionally, her ability to garden is limited due to her inability to prune or trim with

---

**3.** Defendant claims that *Bragdon* does not so hold. While the court was, generally, discussing the ability to reproduce, the court was clearly analyzing the activities that make up the process as reproduction is a result and not an activity.

any sharp instruments and her inability to work the soil. Finally, plaintiff notes that she is limited in her ability to play with her dog for fear of accidental bites or scratches and she is limited in her ability to drive outside of her immediate area. In *Toyota Motor*, the Court considered a person whose "medical condition caused her to avoid sweeping, to quit dancing, to occasionally seek help dressing, and to reduce how often she plays with her children, gardens, and drives long distances." *Id.* at 694. Based on such limitations, the Court concluded that the existence or non-existence of a manual task disability could not be determined as a matter of law. So it is with the present case. The court concludes that it cannot determine as a matter of law that plaintiff's condition does not substantially limit her ability to perform manual tasks. As such, defendants' motion on this point must be rejected. While the court must conclude that defendants cannot show that plaintiff is not disabled as a matter of law for purposes of their motion, the court similarly cannot conclude that plaintiff is disabled as a matter of law on the basis of her inability to perform manual tasks. This is relevant to plaintiff's motion. Thus, the court will consider plaintiff's other major life activities to determine if she can establish a disability as a matter of law.

Plaintiff next claims that her impairments substantially limit her ability to work. With respect to the major life activity of working, the term "substantially limits" means:

significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3) (1996). The major life activity of working does not necessarily mean working at the job of one's choice. *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 942 (10th Cir.1994). In addition to the factors listed in 29 C.F.R. § 1630.2(j)(2), the following factors may be considered in determining whether an individual is substantially limited in the major life activity of "working:"

(A) The geographical area to which the individual has reasonable access;

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(ii) (1996). Plaintiff relies largely on the opinion testimony of Mr. Swearingin to establish a substantial limitation on plaintiff's ability to work. As the court noted above, Swearingin's testimony is not helpful at the summary judgment stage. He indicates that he has reviewed plaintiff's situation and the production worker position at Rubbermaid. Then, he launches into purely conclusory opinions that are surprisingly (or, perhaps, not surprisingly) close to the language of the above noted regulations. The court will not hold, as a matter of law, that plaintiff is disabled based on such conclusory allegations. Again, the court has already recognized that plaintiff clearly has

a limitation on her ability to work. Such limitation would be sufficient to preclude a judgment of non-disability, but is not sufficient to justify a judgment as a matter of law of disability.

Finally, the court will consider plaintiff's claimed limitation on her ability to have sexual intercourse. If plaintiff is substantially limited in her ability to have sexual intercourse, a major life activity, then she would have a disability as defined by the ADA. However, plaintiff has not established a substantial limitation. In fact, plaintiff's determination that sexual intercourse is limited by her ITP appears, based on the record before the court, to be a largely self-imposed restriction. Dr. Cannon advised plaintiff generally to avoid conduct that might cause bleeding or bruising. It appears to the court that plaintiff then concluded that sexual intercourse will fall within that general admonition. While Dr. Cannon observed that the decision was prudent, even plaintiff's brief referred to it as plaintiff's "choice." *See* Plaintiff's Response to Defendants' Motion for Summary Judgment, at 85. The court was not presented with any evidence that bleeding or bruising is likely to occur as a result of sexual intercourse in women with ITP as compared to women without. In short, the risk to plaintiff in this instance is not clear and the court does not consider a self-imposed restriction without any statistical or medical support to be a substantial limitation. Thus, the court cannot conclude, as a matter of law, that plaintiff is disabled. Nor can it conclude that she is not disabled. This is the consummate material question of fact for a jury to determine. The impact of this determination on plaintiff's motion for summary judgment will be discussed below.

### 2. Plaintiff's Status as a Qualified Individual is an Open Issue

▮▮▮▮▮ The Tenth Circuit has adopted a two-tiered analysis for determining whether a person is "qualified" under the ADA. *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1175 (10th Cir.1999). First, the court examines whether the individual can perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if the court concludes that the individual is not able to perform the essential functions of the job at issue, it must determine whether any reasonable accommodation by the employer would enable her to perform those functions. *Anderson,* 181 F.3d at 1175 (citing *Milton v. Scrivner,* 53 F.3d 1118, 1123 (10th Cir.1995)). To avoid summary judgment, the plaintiff must show that she "could perform the essential functions of the job" despite her disability or "that a reasonable accommodation of . . . [her] disability would have enabled [her] . . . to perform the essential functions of the job." *Burch v. City of Nacogdoches,* 174 F.3d 615, 619 (5th Cir.1999).

"The term 'essential functions' is defined as 'the fundamental job duties of the employment position the individual with a disability holds or desires.' " *Martin v. Kansas,* 190 F.3d 1120, 1130 (10th Cir. 1999) (quoting 29 C.F.R. § 1630.2(n)(1)). "Whether a particular function is essential is a factual inquiry." *Martin,* 190 F.3d at 1130 (citing 29 C.F.R. Pt. 1630, App. § 1630.2(n)). The essential functions of a job are "functions that bear more than a marginal relationship to the job at issue." *Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1123 (10th Cir.1995). The inquiry focuses initially "on whether the employer actually requires employees in the position to perform the functions that the employer asserts are essential." 29 C.F.R. Pt. 1630, App. § 1630.2(n); *see Milton,* 53 F.3d at 1124. If the employer does require performance of those functions, "the inquiry will then center around whether removing the function would fundamentally alter the position." *Id.* "[I]n making this inquiry,

'consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.'" *Martin,* 190 F.3d at 1130 (quoting 42 U.S.C. § 12111(8)).

Regulations promulgated under the ADA address some of the relevant factors and evidence to consider:

> (2) A job function may be considered essential for any of several reasons, including but not limited to the following:
>
>> (i) The function may be essential because the reason the position exists is to perform that function;
>>
>> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
>>
>> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.
>
> (3) Evidence of whether a particular function is essential includes, but is not limited to:
>
>> (i) The employer's judgment as to which functions are essential;
>>
>> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
>>
>> (iii) The amount of time spent on the job performing the function;
>>
>> (iv) The consequences of not requiring the incumbent to perform the function;
>>
>> (v) The terms of a collective bargaining agreement;
>>
>> (vi) The work experience of past incumbents in the job; and/or
>>
>> (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630(n)(2) and (3).

Because the determination of what is an essential function often entails considering these different factors and weighing the facts, it "is often best" reserved for the jury. *Ingerson v. Healthsouth Corp.,* 139 F.3d 912, 1998 WL 88154, at *5 (10th Cir.Feb.26, 1998). This "does not mean every 'essential function' inquiry must go to the jury." *Id.* Summary judgment remains appropriate if no reasonable jury could find for the plaintiff after applying the factors on the facts of record. *Id.*

In this case, the employment position at issue is that of a production worker at the Winfield plants. The law does not allow plaintiff to limit the inquiry to a consideration of whether she can perform the essential functions of machine 104 positions. The production worker position, without considering any reasonable accommodations, requires rotation through various positions. Hence, the court must determine the "essential function" of the production worker job and whether plaintiff can perform that function. On the facts of this case specifically, the court must determine whether knife use is an "essential function" of the production worker position, as alleged by defendants. If so, it is clear that within her medical restrictions, plaintiff cannot perform that function.

Having reviewed the relevant factors and evidence listed above, the court concludes that it has insufficient evidence to consider many of the items listed. The court can, however, consider "the employer's judgment as to which functions are essential." Defendants have, at innumerable points throughout their briefing, asserted that knife use is, in fact, an essential function of the production worker position. Nonetheless, defendants never overtly indicated the method by which

that conclusion was reached. However, in their reply in support of their motion, defendants did state the method which was otherwise obvious to the court, by indicating: "[t]he '50% requirement' outlined in the restrictive duty policy defined what those essential functions were." Defendants' Reply in Support, at 14–15. In other words, a function is essential to the production worker position when it is required at 50% of the positions at the Winfield plants at any given point in time. While Marr testified that a knife use restriction would bar plaintiff from over 70% of the positions and plaintiff indicated that she was not aware of any production worker who did not use a knife, others testified differently. Perry Wozney testified that between 42 and 61 of the 80 machines at the Wheat Road plant would not require knife use on a given day or shift. Steven McNinch estimated that between 10 and 60 percent of the machines would not require knife use. While the estimates vary dramatically, the court is convinced that a question of fact exists as to whether knife use could be considered an essential function in view of Rubbermaid's self-imposed 50% rule. If plaintiff could work in more than 50% of the positions at the Wheatfield plants with her knife use restriction, then she would be able to perform the essential functions of the production worker position in Rubbermaid's judgment, which as noted above is an important factor to consider.[4] Given that the question of whether knife use is an essential function is an open issue, the court must conclude that, for summary judgment purposes, the fact has not been established as a matter of law from either sides' perspective. Thus, defendants' motion on this point is denied, and

the court need not consider whether any reasonable accommodations are available. The court notes, however, without reaching the issue, that if plaintiff indicated she could safely use knives with the proper hand, arm, and apron-type protection, then such an accommodation would appear facially reasonable since Rubbermaid already possesses such equipment. Plaintiff may have been able to voice this prospective accommodation and make clear that she desired to work with knives by using the protective equipment had Rubbermaid provided the interactive "walk-around" procedure which its own policy called for in plaintiff's situation. Further, the "walk-around" may have finally determined whether 50% of the machines required knife use in the first instance.

### 3. Discriminatory Action Against Plaintiff Based on her alleged Disability

To defeat defendants' motion on the third element of her prima facie case, plaintiff must establish a genuine question of fact as to whether defendants terminated or took adverse employment action against her "under circumstances which give rise to an inference that the termination [or other action] was based on ... her disability." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997). Because Rubbermaid admittedly terminated plaintiff because of her ITP related restrictions, the court concludes that plaintiff has sufficiently established this prong of the prima facie case so as to avoid summary judgment. The restrictions flow from ITP, which also gives rise to what arguably constitutes plaintiff's disability. The termination, for summary judgment purposes,

---

4. The court notes that plaintiff also has lifting and reaching restrictions. However, Rubbermaid's own 50% policy does not consider that restriction as it was "grandfathered in" under the policy. Thus, Rubbermaid's judgment as to what constitutes an essential function would not be impacted by the other restrictions.

was based on her disability/ies. As a result, defendants are not entitled to summary judgment on the ground that plaintiff has failed to state a prima facie case of disability discrimination under the ADA.

### 4. Legitimate, Non Discriminatory Factors

By establishing her prima facie case, at least for summary judgment purposes, plaintiff raises "a rebuttable presumption" of a discriminatory intent. *See Ingels v. Thiokol Corp.,* 42 F.3d 616, 621 (10th Cir. 1994). However, defendants have the ability to rebut the presumption by articulating a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817, 36 L.Ed.2d 668. Defendants first assert that the 50% standard enunciated in Rubbermaid's restrictive duty policy is job related and consistent with business necessity. The court does not dispute that the 50% standard, for purposes of defendants' motion, is proper. This is not to say that the policy, even as propounded by Rubbermaid, was applied properly in this case. Which leads to defendants' second point, that the decision to terminate plaintiff was also based on legitimate, nondiscriminatory factors because plaintiff was unable to perform the essential functions of her job as defined by the arguably legitimate 50% policy. As previously stated, defendants did not make any quantifiable determination that knife use was an essential function of the production worker position. Because defendants have not established the basic fact underlying this argument, they are not entitled to summary judgment based on legitimate and nondiscriminatory factors leading to the decision to terminate plaintiff.

Next, defendants argue that plaintiff's requested accommodations are unreasonable. This argument is moot, for summary judgment purposes, since the court has concluded that a fact question exists as to whether plaintiff was a qualified individual even without accommodations. Finally, defendants contend that plaintiff was not "regarded as" disabled and that she has not established a record of disability. These are means by which plaintiff could establish that she is disabled within the meaning of the ADA. They may be relevant in considering plaintiff's motion, but because the court has already determined that defendants have failed to establish that plaintiff is not disabled under the primary analysis, the arguments are moot in the context of defendants' motion.

### C. Defendants' Affirmative Defenses to Plaintiff's ADA Claim

Defendants have raised two alleged defenses to plaintiff's ADA claims. First, defendants assert that plaintiff failed to exhaust her administrative remedies. Second, defendants argue that plaintiff should be estopped from asserting an ADA claim due to her having claimed a permanent disability in both her long term disability and Social Security disability claims. The court will address each of these arguments.

### 1. Exhaustion of Administrative Remedies

■ To review the facts, plaintiff was placed on leave of absence no later than January 26, 1999. She was terminated on January 27, 2000. Plaintiff's EEOC and KHRC claims were filed in April 2000 and May 2000, respectively. Defendants' sole attack on this jurisdictional prerequisite is that plaintiff's administrative claims were untimely.

To bring an ADA claim, an employee must file a discrimination charge with the state agency and/or the EEOC within 300 days after the alleged discriminatory act occurred to exhaust his administrative remedies. 42 U.S.C. § 2000e–5(e); *Amro*

*v. Boeing Co.,* 951 F.Supp. 1533, 1553 (D.Kan.1997). Failure to exhaust administrative remedies by filing a charge with the EEOC within 300 days of the alleged unlawful occurrences deprives the court of jurisdiction to consider them. *Robbins v. Jefferson County School District R–1,* 186 F.3d 1253, 1257 (10th Cir.1999).

Plaintiff clearly filed her administrative claims within 300 days of her termination. Defendants' position, however, is that the 300 day clock began running when plaintiff was placed on leave of absence in January 1999. Defendants argue that it was at that time that plaintiff became aware of the restrictive duty policy and the implementation of the policy to her situation. Defendants' position is disingenuous. The uncontroverted facts indicate that plaintiff had no reason to believe she was being terminated, or discriminated against, in January 1999. In fact, Rubbermaid did not treat her as though she was being terminated. Rubbermaid provided her with short-term disability and assistance in obtaining long-term disability, both benefits only available to employees. Further, plaintiff continued to question defendants about when and how she could return to work throughout the year of 1999. The court concludes, for purposes of summary judgment, that the allegedly unlawful employment action did not occur until plaintiff was terminated in January 2000 and plaintiff could not have been expected to file an administrative claim until after that time.

**2. Inconsistent Statements in Social Security and Long–Term Disability Applications**

 Defendants next assert that plaintiff should be estopped from asserting that she is a qualified employee when she claimed in both her Social Security and long-term disability application that she was fully disabled and unable to work. The Supreme Court recently addressed how sworn statements of disability made to the Social Security Administration ("SSA") impact an ADA claim. *See Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). The Court recognized that statements made to the SSA to support a "general" finding of disability do not necessarily conflict with a finding of ability to perform the essential functions of a "specific" job in an ADA claim. *Id.* at 803, 119 S.Ct. 1597 ("an SSDI claim and an ADA claim can comfortably exist side by side"). The Court acknowledged that in some cases the representations made to the SSA may genuinely conflict with the ADA claim. In such cases, the plaintiff must offer a sufficient explanation for the apparent conflict. The Court held that:

> An ADA plaintiff bears the burden of proving that she is "a qualified individual with a disability"-that is, a person "who, with or without reasonable accommodation can perform the essential functions of her job." 42 U.S.C. § 12111(8). And a plaintiff's sworn assertion in an application for disability benefits that she is, for example, "unable to work" will appear to negate an essential element of her ADA case—at least if she does not offer a sufficient explanation. For that reason, we hold that an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather she must proffer a sufficient explanation.

*Id.* at 806, 119 S.Ct. 1597. To defeat summary judgment, the proffered explanation "must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" *Id.* at 807, 119 S.Ct. 1597. While the court recognizes that

plaintiff will have to take special care to explain the inconsistency between her current position and her SSDI claim, the court believes that plaintiff has proffered a sufficient explanation of the conflict that a reasonable juror could conclude that she is able to perform the essential functions of the production worker position despite her statements that she is unable to work. Plaintiff, apart from her daughter, is unable to either understand or read English. Angel Praseuth explained the form to plaintiff and told her it was acceptable to indicate that she could not work as a result of her disability because Rubbermaid had, in fact, told her that she could not work at its plants. In short, the court concludes that a reasonable juror might accept that plaintiff's language difficulties led to a misunderstanding, especially given that Angel has essentially fallen on her sword in accepting responsibility for the confusion. Additionally, the court notes that the Social Security record consisted of medical letters and evaluations tending to demonstrate that plaintiff could perform other work. This court, in *Smith v. Midland Brake*, 98 F.Supp.2d 1233, 1240 (D.Kan. 2000), found the inclusion of medical record relevant as it could further show a jury that the plaintiff was not attempting to mislead the SSA, but had instead misinterpreted the unable to work statement. At any rate, plaintiff is entitled to present her explanation to the jury to have its weight finally determined. The explanation is sufficient to defeat summary judgment.

### D. Plaintiff's ADA Retaliation Claim

As stated in her Amended Complaint, plaintiff alleges that defendants "wrongfully retaliated/interfered with plaintiff's exercise of her right to accept leave of absence as an alternative accommodation by terminating her employment because she accepted a leave of absence." Amended Complaint, at ¶ 56. The ADA provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by this chapter." 42 U.S.C. § 12203(b). Under the ADA, an employee must prove the following elements in order to establish a prima facie case of retaliation: (1) that she engaged in an activity protected by the statute; (2) that "she was subjected to [an] adverse employment action subsequent to or contemporaneous with the protected activity;" (3) that there was a causal connection between the protected activity and the adverse action. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir.1999)

On the first element, plaintiff alleges that the protected activity in which she engaged was the acceptance of an accommodation. Plaintiff asserts that the accommodation at issue was the one year leave of absence. Acceptance of an accommodation is protected activity. Further, despite defendants' contentions otherwise, the Tenth Circuit has indicated that a leave of absence may be considered a reasonable accommodation. *Hudson v. MCI Telecommunications Corp.*, 87 F.3d 1167, 1169 (10th Cir.1996). The court thus concludes that plaintiff has established the first element for summary judgment purposes. Additionally, the court concludes, noting the discussion above, that termination is an adverse employment action, satisfying the second element of plaintiff's retaliation claim.

The court finds most interesting the causation element of plaintiff's claim. Plaintiff's sole piece of evidence to establish this element comes from defendants' answer to the Amended Complaint, which alleged that "[p]ursuant to company policy, plaintiff was terminated because she had been on leave of absence for one year." Answer Amended Complaint, at ¶ 41.

While considering this allegation on its own may support plaintiff's position, viewing the record as a whole leads the court to conclude that plaintiff was terminated because she had exhausted the allowed leave of absence and remained under the restrictions which Rubbermaid felt precluded her from the essential functions of her job. In other words, plaintiff was terminated because of the continued existence of her restrictions at the end of the leave of absence period, not because she took the leave of absence. Considering the entire record, the court sees no factual controversy as to the reason for plaintiff's termination—Rubbermaid terminated her because it believed she could not perform 50% of the production worker positions. Plaintiff, in fact, advanced this argument in support of her ADA discrimination claim, but now does an about-face to save the retaliation claim.

Additionally, Rubbermaid did not terminate plaintiff until the end of the leave of absence, one year after the accommodation was initially instituted. The accommodation was thus fully exhausted at the time the termination occurred. In this instance, plaintiff cannot rely on the temporal proximity to support her assertion of causation. The Tenth Circuit has held that even a three month interval between the commencement of the protected activity and the adverse employment action is insufficient to justify an inference of causation. *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997). Defendants did not terminate plaintiff when she accepted the leave of absence nor did they terminate her until after the leave of absence was fully exhausted. The court concludes that plaintiff has failed to raise a triable issue on the question of causation and thus grants defendants' motion for summary judgment as to plaintiff's ADA retaliation claim.

### E. Plaintiff's Breach of Contract Claim

Primarily, plaintiff relies on the alleged statement of Vaughn Burkholder, an attorney representing Rubbermaid in negotiations with plaintiff pertaining to an earlier workers' compensation claim. Plaintiff alleges that, in the course of those earlier negotiations, Burkholder stated to plaintiff that she would not be terminated but for cause. For purposes of the instant motion, defendants concede that the statement was made. They contend, however, that Burkholder lacked authority to bind Rubbermaid to an employment contract since his purpose was only to deal with plaintiff's workers' compensation claim.

The court has little doubt but that Burkholder would be considered to have either express or implied authority to enter contracts as an agent of Rubbermaid. However, that authority would be limited to actions taken within the scope of his authority. Having reviewed the limited facts provided pertaining to Mr. Burkholder's status with Rubbermaid, the court cannot determine the exact scope of his authority. Defendants argue that plaintiff has not provided any evidence that the alleged statement, or promise, was within the scope of his authority. Plaintiff has, however, presented at least sufficient allegations to survive a motion to dismiss. With that said, for purposes of summary judgment, it is defendants who must establish, as a matter of law, that the alleged statement was not within Burkholder's scope of authority. Having failed to do so, defendants are not entitled to summary judgment on plaintiff's breach of contract claim.

### F. Plaintiff's Fraud Claims

Plaintiff claims that defendants committed fraud by silence to the extent that Rubbermaid and its representatives

knew plaintiff would not be returning to work in January 1999 and did not inform plaintiff of this fact. The court need not go into a detailed analysis of the law as it pertains to fraud by silence in Kansas. This task is avoided because plaintiff's claim fails under the uncontroverted facts of this case. The very essence of plaintiff's claim is that plaintiff was fired, at least in effect, in January 1999 and defendants failed to inform plaintiff of this fact. The claim fails as the facts all indicate that plaintiff was not, in effect, fired in January 1999. While the restrictive duty policy seemingly calls for a person in plaintiff's position to be terminated upon recognition of a permanent restriction, she was not so treated in this instance. In fact, defendants treated plaintiff as a continuing employee throughout 1999. She received short term disability benefits. She was allowed a one-year leave of absence. Both of these benefits are given only to Rubbermaid employees. The court thus concludes that, as a matter of uncontroverted fact, plaintiff was viewed and treated as a Rubbermaid employee throughout 1999. The Littrell testimony cited by plaintiff in her Second Supplemental Response does not alter this conclusion for the reasons noted above in the statement of fact. Having concluded that plaintiff was not, in effect, terminated in January 1999, it follows that failing to so inform plaintiff cannot constitute fraud by silence. Defendants are entitled to summary judgment on plaintiff's fraud claims.

### G. Plaintiff's Common Law Invasion of Privacy Claim

Plaintiff alleges that both corporate defendants, (now limited to Rubbermaid alone) tortiously invaded her privacy by giving publicity to private facts, i.e., her medical conditions. The facts indicate that plaintiff's condition was widely known on the production floor. They also indicate that plaintiff did not present any evidence that the information came from a supervisor as opposed to another source. Plaintiff asserts, however, that the inference should be drawn that because non-supervisory employees knew of her condition and plaintiff had made the condition known only to her supervisors, her supervisors must have publicized her condition. For purposes of summary judgment, plaintiff likely has generated a question of fact on both required elements for her claim, i.e., publicity and private facts.

 Nonetheless, the court concludes that plaintiff's claims must fail because she has not established a basis for corporate liability for the alleged tortious conduct of its employees. Under Kansas law, Rubbermaid can be held liable for an invasion of privacy by its agents only if the agents, at the time of the alleged invasion, were acting within the scope of their authority and within the course of their employment, or in an effort to advance Rubbermaid's interests. *See Williams v. Community Drive-in Theater, Inc.,* 214 Kan. 359, 366, 520 P.2d 1296 (1974). An employee is acting within the scope of his or her employment if the employee is performing services for which the employee has been employed or is doing anything reasonably incidental to the employment. *Commerce Bank of St. Joseph, N.A. v. State,* 251 Kan. 207, 210, 833 P.2d 996 (1992). The test is not necessarily whether the specific conduct was expressly authorized or forbidden by the employer, but whether such conduct should have been fairly foreseen from the nature of the employment and the duties relating to it. *Id.*

 In this case, plaintiff has utterly failed to produce any specific evidence of any particular Rubbermaid employee who publicized plaintiff's medical condition. Nonetheless, Rubbermaid's policy clearly mandates that all supervisory employees maintain medical restrictions and condi-

tions in the strictest of confidence. It is thus clear that if any management level employee did engage in the alleged tortious conduct, he or she was acting outside the scope of the employee's employment and was not furthering Rubbermaid's interests. Further, Rubbermaid offers various testimony indicating that it had no reason to foresee, based on the nature of the several supervisors' employment, that the alleged tortious conduct would occur. Plaintiff has not presented any facts to refute that position. The court thus concludes that plaintiff has failed to controvert defendants' allegations and has failed to properly establish a basis for liability on the part of Rubbermaid, or any of the corporate defendants. As such, defendants are entitled to summary judgment on plaintiff's invasion of privacy claim.

**H. Defendants' Damages Arguments**

■ Defendants first argue that plaintiff is not entitled to the damages she seeks because she failed to mitigate her damages. In a discharge case, the plaintiff's duty to mitigate is fulfilled by "seeking other employment." *United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 938 (10th Cir.1979). This duty to seek other employment is based on the language in the statute which reduces back pay awards by "interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against." 42 U.S.C. § 2000e–5(g). Thus, in order to avoid a reduction in damages, plaintiff must make a reasonable and good faith effort to mitigate damages. *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1158 (10th Cir.1990). Defendants have the burden of proving plaintiff failed to exercise reasonable diligence in mitigating damages. *Id.* at 1158. This burden of proof requires the defendant to show: "(1) that the damage suffered by plaintiff could have been avoided, i.e. that there were suitable positions available which plaintiff

could have discovered and for which he was qualified; and (2) that plaintiff failed to use reasonable care and diligence in seeking such a position." *Equal Employment Opportunity Com'n v. Sandia Corp.*, 639 F.2d 600, 627 (10th Cir.1980).

■ In this case, defendants rely solely on what they represent as the very limited efforts of plaintiff to obtain employment. The level of effort plaintiff has exerted and the type of jobs she has considered is, at this point, a material question of fact. Even if plaintiff had not raised a controversy as to her level of effort, defendants have not come forth with any evidence showing that other comparable positions were available for the plaintiff. Without this evidence, defendants are not entitled to judgment as a matter of law on plaintiff's damage claim.

■ Defendants also argue that plaintiff is not entitled to punitive damages. Plaintiff's claim to punitive damages is based upon her ADA discrimination claim and her fraud and invasion of privacy claims. Plaintiff has requested $5,300,000 in punitive damages. At this point, plaintiff's fraud and invasion of privacy claims have been dismissed. Thus, she is entitled to pursue only the $300,000 available under federal anti-discrimination law. 42 U.S.C. § 1981a(b)(1), (3). Plaintiff has raised sufficient material facts so as to pursue her assertion that the alleged discrimination was willful. Plaintiff should note, however, the heightened showing which will be required in order to succeed on the punitive claim, as noted in *E.E.O.C. v. Wal–Mart Stores, Inc.*, 187 F.3d 1241, 1245 (10th Cir.1999). Apart from the $300,000 amount, defendants are entitled to summary judgment on plaintiff's claim of an additional $5,000,000 in punitive damages.

## I. Plaintiff's Motion for Summary Judgment

 Plaintiff's motion is a broad based attack against defendants' restrictive duty policy. Plaintiff attacks the policy as being an implementation of facially unlawful standards, tests, and other selection criteria. Plaintiff is thus asserting a per se violation of the ADA via the authorizing provisions of 42 U.S.C. § 12112(a), (b)(6). The statutory language of the enforcement provision of the ADA limits claims to those "alleging discrimination on the basis of disability ...." 42 U.S.C. § 12117(a). More specifically, section 12112(a) states that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." Thus, all claims under the ADA must, at their core, involve allegations of discrimination against individuals with disabilities. An individual who is not disabled under the ADA cannot seek the protections of the statute. This conclusion is not altered by the fact that plaintiff is asserting a per se violation through the implementation of unlawful standards. Section 12112(b)(6) states that the term "discriminate," as used in section 12112(a), includes:

> using qualification standards, employment tests or other selection criteria that screen out or tend to screen out **an individual with a disability or a class of individuals with disabilities** unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

42 U.S.C. § 12112(b)(6) (emphasis added). Thus, on the very face of the statute under which plaintiff purports to proceed, disability is required. Plaintiff has not cited a single case supporting her position that anyone aggrieved by an unlawful standard or test can proceed under the ADA, even without establishing standing through a disability. *See* Plaintiff's Reply Memorandum in Support, at 19–34. The court entirely agrees with plaintiff that the Tenth Circuit has allowed a person without disability to maintain an ADA action based on unlawful medical inquiries and retaliation. The court further agrees that disability is not an essential element unless the statutory text makes it so. The court does not agree, however, that section 12112(b)(6) does not require disability. In fact, as mentioned above, the court concludes that 12112(b)(6) facially requires that the plaintiff or plaintiffs be either an individual with disability or a class of individuals with disability respectively. Hence, the court finds that disability remains an essential element of a claim pursuant to section 12112(b)(6). While the Tenth Circuit has not directly addressed this issue, other courts have determined that disability is required. *See E.E.O.C. v. Murray, Inc.,* 175 F.Supp.2d 1053, 1058 (M.D.Tenn.2001)(discussing § 12112(b)(6) and concluding that "an individual who is not disabled under the ADA cannot seek the protections of the statute"); *Hutchinson v. United Parcel Service, Inc.,* 883 F.Supp. 379, 398 (N.D.Iowa 1995) ("Hutchinson does not have standing, because she is not a person with a disability within the meaning of the ADA; therefore, she is not a person who can assert a claim under 42 U.S.C. § 12112(a)"). In summary, the court concludes that plaintiff cannot succeed on her summary judgment motion unless she can first establish standing as a matter of law.

As noted above, there are three statutory ways to establish disability; plaintiff has chosen to focus only on showing that

she has "a physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2). The other two options consider whether plaintiff was regarded as disabled and whether or not plaintiff has a record of disability. Plaintiff made both of these contentions in the Pretrial Order, but has failed to advance these arguments either in support of her motion for summary judgment or in response to defendants' motion for summary judgment. The court thus deems the arguments waived. Again, as noted above, questions of material fact remain as to whether plaintiff's impairments "substantially limits one or more of [her] major life activities." As such, the court concludes that plaintiff can not establish a disability as a matter of law and thus cannot, at the summary judgment stage, prevail on her section 12112(b)(6) claim. Plaintiff's motion for summary judgment is denied.

IT IS THEREFORE ORDERED this _____ day of July, 2002 that defendants' motion for summary judgment (dkt. no. 274) is granted in part and denied in part as set forth above and plaintiff's motion for summary judgment (dkt. no. 258) is denied.